UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v.   ) | Criminal No. 06-019 (EGS) |
| ) | |
| AKIUBER NDOROMO JAMES, et al.   ) | |
| ) | |

**GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, submits this memorandum in aid of sentencing. For the reasons set forth herein, defendant should be sentenced to a 71-month period of incarceration and ordered to pay the full restitution amount of $1,856,812.71 to the victims in this case, the United States and the District of Columbia.

I.  **Summary**

In this case, defendant Akiuber Ndoromo James, as the President and Chief Executive Officer ("CEO") of the Voice of Social Concern Association ("VSCA"), a non-emergency transportation company, illegally billed the District of Columbia's Medicaid program for over 1.8 million dollars' worth of transportation services that were not provided. As the Court heard during the trial, as part of his scheme to defraud Medicaid, defendant repeatedly billed Medicaid for beneficiaries whom he never transported, who had stopped using defendant's transportation service, or who had died. On March 30, 2007, a jury found defendant guilty of twenty offenses relating to defendant's scheme to defraud the District of Columbia's Medicaid program (3/30/07 Tr. 12-16). The offenses of conviction include health care fraud, in violation of 18 U.S.C. §

1347; making false statements regarding health care matters, in violation of 18 U.S.C. § 1035(a)(2); and money laundering, in violation of 18 U.S.C. § 1957. On April 2, 2007, the jury returned a verdict forfeiting $1,856,812.71 and two vehicles. Dist. Ct. PACER Docket Entry (Apr. 2, 2007).

II.     **Section 3553 Factors Compel a Sentence at the Top of the Guideline Range.**

Defendant deserves a significant punishment for his fraud scheme. The government respectfully submits that the factors set forth at 18 U.S.C. § 3553(a) should compel this Court to impose a sentence at the top of the applicable Guideline range.[1]

    A.  Nature of the Offense

Defendant stole nearly two million dollars from the Medicaid program through his false billing scheme. Defendant did not choose to commit just one crime on one day. During a period of approximately four years, defendant repeatedly billed Medicaid for beneficiaries who were ineligible for transportation services, whom defendant never transported, who had stopped using

---

[1] As this Court is aware, the district court needs to consider the goals of Section 3553 in determining the appropriate sentence, however, the court is not required to specifically refer to each factor listed in § 3553(a). See United States v. Ayers, 428 F.3d 312, 315 (D.C. Cir. 2005). Section 3553(c) provides that the court at the time of sentencing shall state in open court the reasons for its imposition of a particular sentence. Section 3553(a) specifically sets out the factors to be considered: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; to afford adequate deterrence to criminal conduct; to protect the public from further crimes of the defendant; and to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner; (3) the kinds of sentences available; (4) the kinds of sentence and the sentencing range established for the . . . offense . . . as set forth in the guidelines . . . (5) any pertinent policy statement issued by the Sentencing Commission . . . (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and (7) the need to provide restitution to any victims of the offense.

defendant's transportation service, or who had died. As Felicia Rowe, former claims manager at D.C. Medicaid, testified, Medicaid recipients are eligible for Medicaid-covered transportation services to and from their medical appointments only if they have a permanent disability (e.g., "a missing limb, they're wheelchair bound, bedridden or they have some sort of mental disability") or are "temporarily incapacitated" (e.g., "pregnancy, a broken leg") (3/26/07 Tr. 165). In complete disregard for the needy and incapacitated residents of the District of Columbia who rely on Medicaid to get to and from their medical appointments, defendant chose on an almost daily basis to continue his corrupt scheme. By stealing nearly two million dollars from the District's Medicaid program, defendant harmed not only the taxpayers generally, but the District's needy and incapacitated citizens specifically.

In executing this scheme, defendant relied on Mary Khangaa, whom he was dating, to take the master list of alleged clients that defendant had given to her and transfer the names, Medicaid numbers, and other information onto the Medicaid claims forms, HICF 1500's, that she would submit on defendant's behalf or give to defendant to submit to the Medicaid program (3/27/07 Tr. 53, 70-78). As a result, VSCA, which was controlled exclusively by defendant, received nearly two million dollars in undeserved revenue. Defendant's romantic relationship with Ms. Khangaa gave him additional leverage over her and made his fraud scheme more difficult to detect. Defendant was even hoping that he could rely on Ms. Khangaa to lie to the Federal Bureau of Investigation ("FBI") for him – and he instructed her to do so – but, despite their relationship, Ms. Khangaa refused (3/21/07 Tr. 110-17).

Defendant's motive in this crime was simply greed. Defendant's desire for money was so great that not only did he not share his ill-gotten gains with his drivers (defendant paid his drivers

only for trips actually taken), but he made his drivers pay for gas and car repairs, plus fifteen percent out of each paycheck for alleged company overhead expenses, even though he ran the company out of his apartment (3/27/07 Tr. 25-26).

Despite defendant's protestations in his many filings with the Court that he is the victim of a government conspiracy, the evidence clearly demonstrates that defendant knew exactly what he was doing. He has some college education and obtained his Certified Public Accounting ("CPA") certification while still living in Kenya (Presentence Investigation Report ("PSR") ¶ 46-49.) The Medicaid transportation program reimbursement rules were not too difficult for him to understand. He simply chose to ignore them.

One strong indication that defendant knowingly and intentionally sought reimbursement for transportation services that he either did not provide or knew were not covered by Medicaid is his effort to disguise his fraudulent billing scheme. When investigators with the Office of the Inspector General of the Department of Health and Human Services ("HHS-OIG") and the Medical Assistance Administration ("MAA") conducted an audit of VSCA in 2004, and asked defendant to provide his drivers' logs, he repeatedly failed to do so (3/27/07 Tr. 185, 196-99). Defendant was completely aware that the drivers' logs would not withstand scrutiny because they would reflect only a fraction of the trips for which he had billed Medicaid.

B.  History and Characteristics of the Defendant

Although some defendants, especially among those not born in the United States, come before the Court for sentencing with limited educational or economic opportunities, defendant is not similarly situated. He comes from a family of college graduates and himself attended college in Kenya, where he became a CPA, as well as in Egypt and the United States (PSR ¶¶ 36, 46-

49). But instead of using these gifts for good purposes, defendant used them to steal, cheat, lie, and exploit in order to advance his own self-interest.

Moreover, throughout these legal proceedings, defendant has continued to insist that he is the victim of a government conspiracy involving the Court, the prosecutors, and his various defense counsel. As recently as August 7, 2008, defendant filed a pro se pleading in which he repeated the outrageous and baseless allegation that the government had bribed the Court and his counsel in order to obtain favorable rulings at hearings and at trial:

> The defendant will want to know whether the Government will get to Court and Standby Counsel "SOMETHING" during the upcoming sentencing date of October 02, 2008? To gain the support of the Court as it happened in the last two hearings and one trial.

Dist. Ct. PACER Docket Entry #102 (filed Aug. 13, 2008), at 15. In this sense, defendant is a dangerous individual who, if not incapacitated for a substantial amount of time, is likely to continue devising schemes to steal from others. The Court should exercise its authority to protect other innocent victims from defendant. The surest, most effective way to deal with defendant's predilection for fraud and deception is to impose a lengthy period of incarceration.

Defendant's lack of remorse and his lack of respect for the criminal justice system are palpable, and his sentence should reflect that. Defendant's criminal actions should be countered with strong justice.

### C. The Need for the Sentence to Reflect the Seriousness of the Offense

The Guidelines reflect the new consensus that those convicted of economic crimes should not be able to avoid a significant period of incarceration, even where such crimes constitute a defendant's first offense. The legislative history of the Sentencing Reform Act of 1984, which

created the United States Sentencing Commission, made clear that one of the goals of the legislation was to correct what Congress saw as a significant problem in the criminal justice system: the fact that "some major offenders, particularly white-collar offenders . . . frequently do not receive sentences that reflect the seriousness of their offenses." U.S.C.C.A.N., 98th Congress, 2nd Sess. (1984), at 3260.  As Justice Breyer, one of the Sentencing Commission's original members, has explained:

> The Commission found in its data significant discrepancies between pre-Guideline punishment of certain white-collar crimes, such as fraud, and other similar common law crimes, such as theft.  The Commission's statistics indicated that where white-collar fraud was involved, courts grant probation to offenders more frequently than in situations involving analogous common law crimes; <u>furthermore, prison terms were less severe for white-collar criminals who did not receive probation</u>.  To mitigate these discrepancies, the Commission decided to require short but certain terms of confinement for many white collar offenders, including tax, insider trading, and antitrust offenders, who previously would have likely received only probation.

Breyer, "The Federal Sentencing Guidelines and the Key Compromises Upon Which They Rest," 17 Hofstra L. Rev. 1, 20 (1988) (emphasis added).  This approach provides just punishment for the considerable harm that white-collar crimes cause society.  This is particularly true of the harm caused by fraud in the area of government health-care programs, where, as the Court knows, there is an acute need for every dollar to cover the legitimate costs of providing care to the neediest patients.  As Ann E.K. Page, RN, MPH, the Health Systems Administrator of the MAA, explained, "Medicaid covers approximately 25% of the population of DC.  The District's Medicaid program thus has an obligation to ensure that funds are spent wisely to attain as many health benefits as possible for beneficiaries." Exhibit 1, p.2.  Only a sentence at the top of the applicable Guideline range would adequately reflect the seriousness of defendant's crimes and

provide just punishment for his actions.

      D.  The Need for the Sentence to Afford Adequate Deterrence

Only a lengthy period of incarceration would adequately promote respect for the law.  A sentence at the top of the Guideline range would send a powerful, salutary message of deterrence to other service providers who might be tempted to follow defendant's corrupt path:  if you use your approved status with a government program for illicit gain, you will face sure, swift, and severe punishment.  If the extensive false billings submitted by defendant do not result in significant punishment, others may be emboldened to cede to temptation and commit such crimes.  As Health Systems Administrator Page stated, "[W]ith a large number of providers in DC, there is the potential for great loss to the Medicaid program through fraud schemes.  It is imperative that an example be set and that those found guilty of such schemes receive sentences that will deter other providers from committing fraud."  Exhibit 1, p.2.

Furthermore, as mentioned previously, defendant continues to abuse the judicial system by filing multitudinous pleadings repeating the same outrageous and baseless allegations that he is the victim of a government conspiracy.  See, e.g., U.S. District Court PACER Docket Entry Numbers 48, 49, 56, 60, 65, 75, 78, 80, 81, 83, 86.  Such actions are completely inappropriate and argue for a lengthy prison term for this defendant on these charges.

      E.  The Need for the Sentence to Provide Educational or Other Benefits

As mentioned supra, unlike many of the defendants who appear before this Court, defendant has little need for the sentence to provide him educational or vocational training.  Defendant has already had the benefit of post-secondary education.  Similarly, he has no unusual health conditions that merit special treatment.

III.  **Defendant's Total Offense Level is 25**

The PSR has correctly calculated defendant's total offense level at 25 (PSR ¶ 31).  This includes the base offense level of 22 pursuant to U.S.S.G. § 2S1.1(a)(1), i.e., the underlying offense has a base level of 6, pursuant to U.S.S.G. § 2B1.1(a)(2), and an addition of 16 levels for "loss" of over $1,000,000, pursuant to U.S.S.G. § 2B1.1(b)(1)(I).  The PSR writer properly added one point for defendant's conviction under 18 U.S.C. § 1957, pursuant to U.S.S.G. § 2S1.1(b)(2)(A) (PSR ¶ 24).  The PSR writer also properly concluded that the two points for obstruction of justice are warranted here (PSR ¶ 27).  For the reasons set forth, supra, in Part II of this Memorandum, the government is seeking imposition of a 71-month sentence, which is the top of the prescribed Guideline range.

    A.  Loss Valuation is Properly Calculated at Over $1,000,000.

Valuation is governed by U.S.S.G. § 2B1.1(b)(1) and includes all relevant conduct.  See U.S.S.G. § 1B1.3(a)(2) (same course of conduct or common scheme or plan as the offense of conviction).  For purposes of sentencing, the "loss" is the greater of either the actual loss or the intended loss.  U.S.S.G. § 2B1.1, comment (n. 3); see also United States v. Manas, 272 F.3d 159, 165 (2d Cir. 2001) ("Consistent with the provisions applicable to conspiracy cases, the Commentary [of section 2F1.1] states that 'if an intended loss that the defendant was attempting to inflict can be determined, this figure will be used if it is greater than the actual loss."), cert. denied, 537 U.S. 1023 (2002); United States v. Studevent, 116 F.3d 1559, 1561 (D.C. Cir. 1997) (finding actual loss should not limit the amount of intended loss attributed to defendant's crime under § 2F.1.1).  "Actual loss" means the reasonably foreseeable pecuniary harm that resulted

from the offense while "intended loss" includes pecuniary harm that was intended to result from the crime as well as intended pecuniary harm that would have been impossible or unlikely to occur (e.g., an insurance fraud in which the claim exceeded the insured value). U.S.S.G. § 2B1.1, comment (n. 3(A)).

The sentencing judge is "in a unique position to assess the evidence and estimate the loss based upon that evidence," and the Court need only make a "reasonable estimate of the loss." U.S.S.G. § 2B1.1, comment (n.3). The Court need not determine the value of the loss with any degree of precision; a reasonable estimate of the loss based on the available evidence will suffice. See United States v. Carter, 412 F.3d 864, 839 (8th Cir. 2005); United States v. Resurreccion, 978 F.2d 759, 762 (1st Cir. 1992) (intended loss should be used in sentencing, even if imprecise, when larger figure than actual loss).

As the government's evidence at trial demonstrated, as the jury found, and as the PSR properly concluded, the total loss amount in this case was $1,856,812.71 (PSR ¶¶ 5, 17, 23). As explained supra, the total number of trips for which defendant obtained prior authorizations was 180 – even though he billed for 62,631 trips (see Govt. Ex. 158) – and the total amount of money defendant received from D.C. Medicaid for the authorized trips, assuming $33 per round-trip, was only about $6,000 of the approximately $1,863,014.21 he received (Govt. Exs. 19, 163). Thus, the PSR properly added 16 levels for "loss" of over $1,000,000, pursuant to U.S.S.G. § 2B1.1(b)(1)(I)

B. Defendant Obstructed Justice.

At the motions hearing on March 21, 2007, defendant committed perjury when he testified that he was forced to stand out in the hallway naked for two hours during execution of

the search warrant at his apartment. His false testimony under oath further evidences his intent and culpability in the health-care fraud scheme.

Defendant gave the following version of events at the motions hearing. On December 22, 2004, at 6 a.m., defendant heard a loud knock on his door and thought it was a fire (3/21/07 Tr. 54). He was naked and opened his door with the chain still on it to check whether it was a fire (3/21/07 Tr. 54). Agents with big guns broke the chain on his door, took defendant out of his apartment, put him against the wall, handcuffed him, and told him not to move (3/21/07 Tr. 55-56, 60). After defendant spent two hours standing naked against a wall in the hallway outside his apartment, agents told him the time was 8:00 a.m., took him inside, and made him sit at his kitchen table (3/21/07 Tr. 57-58). He was still naked, and the door to his apartment was open (3/21/07 Tr. 58). After another ten or fifteen minutes, an agent brought him a t-shirt and a "trunk suit" to put on (3/21/07 Tr. 59).

In contrast, U.S. Postal Inspector Brian Evans, who participated in the execution of the search warrant at defendant's apartment, testified that defendant was wearing white underwear when he answered the door at 7 a.m. and that defendant was handcuffed and placed in a chair in the corner of his living room (3/21/07 Tr. 18, 20-21, 30, 34). Five or ten minutes later, once the apartment had been secured, the handcuffs were removed, and defendant was given a shirt and pants (3/21/07 Tr. 21, 36, 50). At no time was defendant completely naked (3/21/07 Tr. 21, 26).

U.S.S.G. § 3C1.1 calls for a two-point upward adjustment for any defendant who "willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense. . . ." Application note 4(b) includes within the ambit of § 3C1.1 "committing . . . perjury."

Defendant's sworn testimony at the motions hearing, that he was forced to stand out in the hallway naked for two hours during execution of the search warrant at his apartment, necessitates an upward adjustment for obstruction of justice. As the Court stated in discussion with counsel on the record after defendant was convicted,

> I don't think he told the truth under oath [during the motions hearing]. I found his testimony to be absolutely preposterous. I don't believe him a bit. Indeed, there may well be a basis for a perjury conviction if the government wants to pursue it. There's probably a basis of some sort of adjustment, obstruction of justice, giving false testimony. I didn't believe anything he said.

(3/30/07 Tr. 35:11-17.) As the PSR properly concluded, defendant's deliberately false and obstructive testimony justifies a two-level enhancement for obstruction of justice (PSR ¶¶ 18, 27).

    C.  <u>Defendant Was Convicted of Money Laundering under Section 1957.</u>

Sentencing Guidelines § 2S1.1(b)(2) sets forth that an offense level should be increased by one level if a defendant is convicted under 18 U.S.C. § 1957. The defense has not objected to this enhancement.

Defendant was convicted of money laundering under 18 U.S.C. § 1957 because he had spread out the proceeds from his illegal billing scheme over seven bank accounts. The Guidelines, therefore, call for a one-level increase due to defendant's money laundering conviction.[2]

---

[2] Most, if not all, of the funds in these accounts would constitute "profits" rather than "gross receipts." These moneys, received from falsely billing Medicaid, remained after defendant paid his drivers – based on the number of clients actually transported – and Ms. Khangaa. Thus, even if the recent Supreme Court decision in <u>United States v. Santos</u>, __ U.S. __, 128 S.Ct. 2020 (June 2, 2008), applies to charges under 18 U.S.C. § 1957, as well as those under 18 U.S.C. § 1956, these monetary transaction counts are supported by evidence presented at trial.

IV.  **Restitution**

The Court should order defendant to pay the full restitution amount of $1,856,812.71 to the victims in this case, the United States and District of Columbia Medicaid programs, as specified in the PSR ¶ 77.

## CONCLUSION

WHEREFORE, the government respectfully requests that this Court impose a 71-month period of incarceration and order defendant to pay full restitution to the United States and District of Columbia Medicaid programs.

Respectfully submitted,
JEFFREY A. TAYLOR
D.C. Bar #498610
United States Attorney


   /s/
ELLEN CHUBIN EPSTEIN
D.C. Bar #442861
SUSAN BETH MENZER
D.C. Bar #421007
Assistant United States Attorneys
555 Fourth Street, N.W., Room 5255
Washington, D.C.  20530
(202) 514-9832
Ellen.Chubin@usdoj.gov

CERTIFICATE OF SERVICE

      I HEREBY CERTIFY that a copy of the foregoing Government's Memorandum in Aid of Sentencing has been served by first-class mail upon defendant, Akube W. Ndoromo, DCDC #309-364, CCA/CTF, 1901 E Street, S.E., Washington, DC 20003; by ECF notification upon stand-by counsel for defendant, Andrea Antonelli, Esq., and by fax upon Crystal Lustig, fax 202-273-0242, U.S. Probation, on this 15th day of September, 2008.

      /s/_____
      ELLEN CHUBIN EPSTEIN
      ASSISTANT U.S. ATTORNEY